## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### (Baltimore Division)

| | |
|---|---|
| In re: | ) |
| | ) **Bankruptcy Case:** 13-12198 |
| **INNER HARBOR WEST, LLC** | ) |
| | ) |
| **Debtor** | ) **Chapter 7** |
| | ) |
| | ) |

| | |
|---|---|
| **INNER HARBOR WEST, LLC, Debtor** | ) |
| | ) |
| **WESTPORT PARTNERS, LLC,** | ) |
| **PATRICK TURNER** | ) |
| **THOMAS B. FORE** | ) **Adversary No.** |
| | ) |
| *Plaintiffs* | ) |
| | ) |
| **v.** | ) |
| | ) |
| **VISION CAPITAL PARTNERS, LLC** | ) |
| **EDWARD BAILEY** | ) |
| **VICTOR SCHWARZ** | ) |
| **DOUGLAS TOWLER** | ) |
| **WARHORSE-BALTIMORE REAL ESTATE, LLC** | ) |
| **RICHARD BURTON** | ) |
| **DALE DOWERS** | ) |
| **MICHAEL BORDEN** | ) |
| | ) |
| *Defendants* | ) |
| | ) |

## COMPLAINT

Plaintiffs, Inner Harbor West, LLC ("Debtor"), Westport Partners, LLC
("Partners,") Patrick Turner ("Turner") and Thomas B. Fore ("Fore") (collectively,
the "Plaintiffs"), by their respective undersigned attorneys, file this complaint

against Vision Capital Partners, LLC ("Vision,") Edward Bailey ("Bailey,") Victor Schwarz ("Schwarz,") Douglas Towler ("Towler,") (Warhorse-Baltimore Real Estate, LLC ("Warhorse,") Richard Burton ("Burton,") Dale Dowers ("Dowers,") and Michael Borden ("Borden,") (collectively, "Defendants") and allege as follows:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§151, 157, and 1334.

2.    This adversary proceeding is commenced pursuant to Rule 7001, et seq. of the Federal Rules of Bankruptcy Procedure and Sections 502, 547, 550 and 551 of 11 U.S.C. § 101 et seq. (the "Bankruptcy Code").

3.    This adversary proceeding is a "core" proceeding to be heard and determined by the Bankruptcy Court pursuant to 28 U.S.C. § 157(b)(2)

4.    Venue is proper in the District of Maryland pursuant to 28 U.S.C. § 1409 in that this proceeding arises in and relates to a bankruptcy case pending in the district and the claims alleged herein arose in this district.

## NATURE OF THE ACTION

5.    This adversary proceeding seeks (a) declaratory relief, (b) money damages, and (c) other equitable relief, intended, *inter alia,* to preserve and recover property or other rights belonging to the estate, limit the amount of claims against the estate, determine the validity and extent of liens, and seek adjustments in the debtor-creditor and equity security holder relationships.

6.    The allegations set forth describe causes of action for breach of contract, fraudulent misrepresentation, and conspiracy, aiding and abetting, arising from Defendants' conversion of Debtor's and/or the other Plaintiffs' opportunity to acquire a promissory note secured by a first mortgage on Debtor's real estate at a substantial discount.  Defendants conspired among themselves to secure the right to purchase the note without Plaintiffs' knowledge or consent in direct violation of an express written agreement, with the intention of immediately reselling the loan at a profit or foreclosing on the mortgage and reselling the property.  These allegations support a judgment declaring Defendants' actions in acquiring the loan or securing contract rights to do so were equitably undertaken for the benefit of the Debtor and the other Plaintiffs, and justify equitable relief preserving the *status quo,* and imposing a constructive trust on such property or rights to acquire property and prohibiting continued disclosure of confidential information.

## THE PARTIES

7.    On February 8, 2013, an involuntary chapter 7 bankruptcy petition was filed against Inner Harbor West, LLC (the "Debtor") a Maryland limited liability company.

8.    Plaintiff Westport Partners, LLC ("Partners") is a Maryland limited liability company, having its principal place of business at 1122 Kenilworth Drive, Suite 100, Towson, MD 21204.

9.    Plaintiff Thomas B. Fore ("Fore") is a resident of the state of Maryland with an address of 1122 Kenilworth Drive, Suite 100, Towson, MD 21204.

10.  Plaintiff Patrick Turner ("Turner")is a resident of the state of Maryland with an address of 1700 Beason Street, Baltimore, MD 21230.

11.  Defendant Vision Capital Partners, LLC ("Vision,") is a limited liability company with a principal place of business at 999 Murray Holladay Road, Suite 109, Salt Lake City, UT 84117.

12.  Defendant Douglas Towler ("Towler") is a resident of the state of Utah with an office address of 999 Murray Holladay Road, Suite 109, Salt Lake City, UT 84117

13.  Defendant Victor Schwarz ("Schwarz") is a resident of the state of Utah with an office address of 999 Murray Holladay Road, Suite 109, Salt Lake City, UT 84117

14.  Defendant Edward Bailey ("Bailey") is a resident of the state of Utah with an office address of 999 Murray Holladay Road, Suite 109, Salt Lake City, UT 84117

15.  Defendant Warhorse-Baltimore Real Estate, LLC ("Warhorse,") is a Nevada limited liability company, with an address of 5920 S. Rainbow Blvd, Suite 11, Las Vegas Nevada, 89118.

16.  Defendant Richard Burton ("Burton") is a Nevada resident with an address of 5920 S. Rainbow Blvd, Suite 11, Las Vegas Nevada, 89118.

17.  Defendant Dale Dowers is a Nevada resident with an address of 5920 S. Rainbow Blvd, Suite 11, Las Vegas Nevada, 89118.

18.  Defendant Michael Borden is a Nevada resident with address of 5920 S. Rainbow Blvd, Suite 11, Las Vegas Nevada, 89118.

19.  Turner, Fore, Westport Development, Holdings, CRP and other individuals and entities with direct or indirect interests in the success of the Project are collectively referred to as "Westport."

## STATEMENT OF FACTS

20.  Beginning in 2005, Turner and other partners conceived of plan to develop a mixed use real estate project (the "Project,") on land theretofore used primarily for industrial purposes located in the Middle Branch of the Baltimore Harbor.  The development plan for the Project required the assembly of a number of individual parcels and the completion of numerous significant tasks, including assessment and resolution of environmental issues, securing governmental approvals such as zoning changes and tax increment financing ("TIF",) and marshalling the support of neighborhood and other special interest groups.

21.  Such an undertaking required a large amount of capital, and ultimately Turner negotiated a $30 million loan (the "Loan") from Citibank Global Markets Realty Corp. ("Citibank").  Pursuant to a Loan Agreement dated as of July 16, 2007, (collectively with amendments thereto, the "Loan Agreement,") among Citibank (sometimes also referred to as "Lender,") and Middle Branch Development, LLC (the "Borrower"), Inner Harbor West, LLC (the "Debtor") and Inner Harbor West II, LLC ("IHW II") (the Debtor and IHW II are collectively  referred to as the "Mortgagor,") Lender agreed to make the Loan to Borrower, evidenced by a

Promissory Note in the maximum principal amount of Thirty Million and no/100 Dollars ($30,000,000) dated as of July 16, 2007 (collectively with any subsequent amendments, referred to as the "Note"). The Loan was secured by an Indemnity Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of July 16, 2007, executed by Mortgagor in favor of Lender (the "Mortgage") encumbering approximately 42 acres of real property in Baltimore owned by Mortgagor  (the "Property").

22.  Debtor and IHW II are single member limited liability companies wholly owned by Westport Development. The membership interests in Westport Development are owned 60% by Westport Property Holdings, LLC ("Holdings") and 40% by CRP Westport Holdings, LLC ("CRP"). Turner is the manager and owner of approximately 36% of the membership interests in Holdings.

23.  The proceeds of the Loan and other funds were used to assemble the Property and undertake the tasks described above as well as other pre-development work including but not limited to architectural and land use planning, environmental studies and remediation, engineering for site work and utilities, and other site infrastructure work. Comprehensive zoning was obtained as well as other entitlements, master plan approval, qualification of the Property for various federal, state and local programs, and the Mayor and City Council of Baltimore (the "City") approved TIF financing for certain public improvements for the Property. As the Project progressed negotiations ensued with third-party developers to purchase individual parcels of the Property for residential and other uses.

24. Beginning in late 2007, the real estate industry worldwide entered into an extended period of rapid and dramatic deterioration. Those conditions ultimately had a material, negative impact on the Project, and in 2010, the Borrower and the Mortgagor were no longer able to make the required payments on the Loan and Turner and others sought to refinance the Project.

25. As a key element of a plan to refinance the Project, the parties entered into a Deed in Lieu Event Agreement (the "Forbearance Agreement") dated as of July 26, 2010, among Citibank, Borrower, Mortgager, Turner and others, in which Citibank agreed to forbear from pursuing its remedies for nonpayment and sell the Loan and other related interests for $8.5 million (the "Purchase Price") in exchange for certain interim forbearance payments to be treated as payments of principal and interest and applied against the Purchase Price upon completion of the purchase by an agreed-upon deadline (the "Purchase Deadline").

26. The Purchase Deadline was extended nine times by amendments to the Forbearance Agreement. During each period covered by the Forbearance Agreement as amended, Fore and others, individually and on behalf of the Debtor and related entities, made the forbearance payments and paid other obligations of Mortgagor, including real estate taxes and other expenses, totaling in excess of $1.5 million.

27. After lengthy negotiations and purported due diligence, on August 19, 2011, Fore obtained a commitment for a $9.5 million loan to acquire the Loan and provide additional capital for the Project. The prospective lender required a substantial fee

as a condition of issuance of the commitment and the parties anticipated a closing in September, 2011.  In anticipation of the scheduled closing, the last Purchase Deadline was allowed to expire on September 15, 2011.

28.  The lender continued to interpose spurious obstacles to the closing until finally on October 25, 2011, the lender notified the parties of its refusal to complete the loan.  Subsequent investigation revealed the lender was engaged in a widespread scheme to defraud numerous borrowers by accepting fees for the issuance of commitment for loans they never intended to fund.  On information and belief a class action lawsuit is currently pending against the lender and its principals, as well as one or more criminal investigations.

29.  The unanticipated collapse of their financing was a major setback for the Project.  Fore, Turner and others restarted their search for a source of funds financing to purchase the Loan.  At all times, Citibank continued to cooperate notwithstanding the expiration of the Forbearance Agreement.

30.  On July 12, 2012, in a telephone conversation between Turner and Lynn Forsell ("Forsell,") one of Citibank's representatives with responsibility for the Loan, Turner again proposed terms for the purchase of the Loan, taking into account the forbearance payments made to date.  On July 13, Forsell sent an email to Turner in which she set forth the following terms, subject to the execution of binding documents:

| | | |
|---|---|---|
| Purchase price | $6,900,000.00 | |
| Expense Reimbursement | $236,028.00 | Legal, taxes and utilities |

| Total Consideration | $7,136,028.00 |
|---|---|

PAYMENTS:

| Up-front Deposit | $3,500,000.00 Due upon signing of Purchase Agreement |
|---|---|
| Payment #2 | $1,818,014 Due by 9/1/12 |
| Payment #3 | $1,818,014 Due by 11/1/12 |

31.  Believing Turner had identified a source of funds to purchase the Loan, Citibank caused a draft Loan Purchase Agreement to be prepared embodying those terms.  That source of funds did not materialize, however, and although beginning to lose patience, Citibank continued to express its willingness to complete the transaction.

## Establishment of Relationship with Vision

32.  Fore had a long-standing business relationship with Jeanine Davis ("Davis,") principal of Vortex Investments, LLC ("Vortex,") a financial consultant located in Richmond, Virginia.  An agreement was executed with Vortex on November 7, 2012, pursuant to which Vortex agreed to provide financial consulting services for the purpose of identifying potential sources of funds for Westport to purchase the Loan and refinance the Project.

33.  In an email on November 16, 2012, to Fore and Fore's Vice-President for Development Patrick Rhodes ("Rhodes,") Davis reported that Vision had made a preliminary review of information supplied by Davis and expressed an interest in the Project.  Vision was one of four potential sources of capital Davis identified for Westport.

34.  Because of the high profile nature of the Project, the involvement of the City of Baltimore and State of Maryland, and prior experiences with disreputable lenders, the integrity of any potential investors or partners was of primary concern to Plaintiffs.  Davis' preliminary research on Vision was positive and after an initial internet search Rhodes agreed to talk to them. Davis arranged an introductory telephone conference among Rhodes, Schwarz and other representatives of Vision at 5:00PM on November 16, 2012.  In that conference Schwarz described Vision and its method of doing business.  Shwarz said Vision's partner in its investments was MSD Capital, Inc., ("MSD,") a New York based investment firm devoted exclusively to managing the capital of Michael Dell and his family.  Because of Plaintiffs' prior experience regarding advance payment of fees Rhodes specifically asked about financial obligations to Vision prior to receipt of a firm commitment.  Schwarz said Vision would perform the necessary due diligence at their own expense except for actual out-of-pocket travel expenses to be advanced by Plaintiffs.  Schwarz said if after completion of their due diligence Vision decided to proceed with a transaction, Plaintiffs would be obligated to pay Vision's attorneys fees for preparation of the necessary documentation of the transaction.

35.  Based on a "high level review" of the information supplied by Davis, Towler sent an email to Fore and Davis on November 19, 2012, containing a list of approximately 30 questions about the Project and the proposed transaction. Comprehensive answers to those questions required disclosure of confidential and proprietary information and Plaintiffs were unwilling to provide that information

without assurance it would not be disclosed to others or used by Vision or their partners or consultants to circumvent Plaintiffs and acquire the Note.

### The NDA

36.  In a conference call at 12:45PM on November 20, 2012, Plaintiffs told Vision they required execution of a confidentiality and non-disclosure agreement prior to responding to Vision's questions.  Vision agreed to sign such a document and offered to provide a draft for review.

37.  At approximately 4:30PM on November 20, Towler sent the first draft of an agreement for review.  On November 21, 2012, the day before Thanksgiving, Rhodes sent Towler a revised version of the document, saying "We've added entities and non-circumvention language to your NDA.  Please review and execute if you are okay with the additions and we can turn around the answers to your questions immediately."  Towler replied within 10 minutes saying "We probably will not get this turned until Friday."

38.  Shortly thereafter Plaintiffs discovered Citibank filed a Notice of Order to Docket Foreclosure in the Circuit Court for Baltimore City on November 20, 2012, and advised Vision of that fact.

39.  On Monday, November 26, 2012, Towler sent Rhodes a final draft of the Mutual Confidentiality and Non-Disclosure Agreement (the "NDA") to be executed among Vision, Partners, Development, Turner and Fore.

40.  Rhodes received a fully executed copy of the NDA on November 27, 2012. A copy of the NDA is attached hereto as Exhibit 1.

41.  For the purposes hereof, the significant provisions of the NDA are Section 1, "Confidentiality and Non-Circumvention" and Section 4, Remedies.

42.  In Section 1(a) of the NDA the parties agree not to disclose confidential information to anyone other than the parties and their agents, partners or employees without the written consent of the other party.

43.  Section 1(b) of the NDA states as follows:

> Westport and Vision agree that they will not, and will require that their *partners, consultants and agents and any other person to whom they show the Project* to and any of that person's partners, members, officers, employees, consultants and agents, for a period of one (I) year commencing from the date of this Agreement, without the prior written consent of the other party, will not, contact directly, or indirectly, any person or entity, including but not limited to management of any person the parties have introduced the other party to or circumvent Westport and Vision position with respect to an introduced party or opportunity or any other party introduced to Westport and Vision. Westport and Vision further agrees they, or any of the other parties referred to herein, *will not enter into any agreement or relationship with any introduced party or opportunity except through the efforts and approval of Westport or Vision as the case may be.* (Emphasis supplied.)

44.  Section 4 of the NDA, "Remedies," states as follows:

> The parties hereby specifically acknowledge that monetary damages to any of them for breach of this Agreement may be difficult to determine and/or inadequate to compensate the parties for such breach and the parties hereby agree that, in the event of any breach, in addition to any other remedies a party or parties may have under the terms of this Agreement or at law, *the non-breaching party or parties shall have the right to bring an action in equity for an injunction* against the breach or threatened breach or seek specific performance of the obligations of the breaching party under the terms of this Agreement. In addition to any damages awarded at law or equity, *the parties acknowledge and agree that the disclosure of information or the circumvention*

*contemplated hereby may cause considerable damage* for which the
offending party may also be held pecuniary liable. (Emphasis added.)

### Vision's Extensive Due Diligence

45.  During the ensuing two months, Plaintiffs supplied extensive, detailed
information regarding the Property, the Project and the Loan, most of which was
private, confidential information developed by Plaintiffs at substantial cost over a
number of years, together with private access to its professionals and consultants .

46.  Shortly after receiving the fully executed NDA on November 27, 2012,
Rhodes sent an email to Towler, Bailey and Schwarz providing answers to the
questions posed by Vision along with copies of an environmental summary and a
statement of sources and uses of funds.

47.  On November 30, 2012, Rhodes emailed Towler and Bailey advising them a
complete set of due diligence files related to the Project was being uploaded to
Vision's online Sharepoint account.  Approximately 249 documents were uploaded,
comprising approximately 675MB of data.  The overwhelming majority of those
documents were not public and contained highly sensitive and proprietary
information about the project including financial projections, architectural,
engineering and environmental data, organizational documents, drafts of contracts,
insurance documents and other documents and information not publicly available
(the "Basic Documents").

48.  Because prior attempts to purchase the Note had not materialized, Turner
did not wish to risk further damage to his credibility with Citibank.  Therefore,
until the relationship with Vision progressed to a point where it seemed that a

transaction was likely Turner did not want to put Vision in direct contact with Citibank.

49. On November 30, 2012, Schwarz emailed a list of five questions to Turner which Schwarz asked Turner to submit to Citibank. That day Turner forwarded the questions in an email to Forsell. In that email Turner said he was working with Vision to fund the project and secure the Note. Rather than answer the questions, Forsell responded curtly and said Citibank was proceeding with its plans to foreclose the Note and was not entertaining offers at that time.

50. Following conversations with other representatives of Citibank it was determined that Forsell's email was a reaction to the apparent preliminary nature of Vision's questions. Those representatives suggested Citibank would be receptive to an offer from an investor who had completed its due diligence investigation and was in a position to make a firm commitment to complete a transaction without further delay. That information was conveyed to Towler and Schwarz.

51. From November 30 through December 3, Towler and/or other agents or employees of Vision continued an intensive review of the Basic Documents and other due diligence activities. Numerous emails were exchanged requesting detailed information on the sources and uses of funds advanced by Citibank and other investors, the cost of acquisition of the real estate, questions regarding entitlements, zoning and tax increment financing ("TIF,") engineering, environmental issues, etc.

52. On November 30, 2012, Towler spoke to Deputy Mayor Kaliope Parthemos, who expressed the City of Baltimore's support for the project.   In an email that day, Towler characterized his conversation with Parthemos as "very productive."

53. On December 1, 2012, Towler wrote an email to Turner reiterating his need for confirmation that Citibank was in fact willing to sell the Note, saying Schwarz was attempting to contact counsel to Plaintiffs to arrange a conference call with Citibank's local counsel to discuss the matter.

54. On December 3, 2012, Towler emailed counsel for Plaintiffs indicating a desire to visit the Project site and meet with representatives of the Maryland Department of the Environment, the Deputy Mayor of Baltimore, other city representatives familiar with the Project, the author of the appraisals of the Property, and a representative of the real estate brokerage firm CB Richard Ellis ("CBRE") who had provided services to the Project.  Towler asked Plaintiffs to purchase his airplane ticket and pay his hotel expenses which Plaintiffs did.

55. Towler arrived in Baltimore on the evening of December 4, 2012, and met with Turner and Rhodes at Turner's office on December 5.  Turner made an extensive PowerPoint presentation about the Project and answered many questions posed by Towler.

56. Turner arranged a number of meetings for Towler in response to Towler's requests.  Following the Powerpoint presentation, Turner, Rhodes and Towler met for approximately 45 minutes with the two former employees of the Baltimore Development Corporation ("BDC") who were the City's project managers for

15

Westport.  During that meeting they gave Towler detailed information about BDC's involvement, their opinions of the Project, details about the TIF for the Project, the City's views of Turner and his relationships with various local and municipal persons and entities, and answers to questions about possible concerns about the Project's feasibility.

57.  Turner and Rhodes then took Towler to the site, where they were met by Denise Sullivan, one of the Project's environmental consultants, and three representatives of the Maryland Department of the Environment ("MDE") including Gary Schold, the head of MDE's Voluntary Cleanup Program.

58.    The site inspection continued for more than 45 minutes during which time Towler asked numerous questions about environmental conditions, potential environmental risks and related issues.  The representatives of MDA confirmed Turner's representations that to the extent environmental issues remained to be addressed, none were of a significant enough nature to impede development of the Project.

59.  Turner, Rhodes and Towler then went to the offices of CBRE where they met with John Wilhide for approximately 45 minutes.  During that meeting Wilhide gave Towler detailed information about the Baltimore real estate market, including absorption rates for residential, office and commercial uses, along with Whilhide's views of the Project.  Whilhide provided contact information for Michael Muldowney, CBRE's apartment specialist with whom Towler subsequently spoke.

60.  Turner, Rhodes and Towler then drove through several other areas in Baltimore city, after which they met at Fore's office for approximately 45 minutes with Greg Jones, the author of two appraisals of the Property.  Towler and Jones reviewed the appraisals in depth, including Jones' appraisal methodology, and Towler asked Jones to provide a "worst case" evaluation.  Towler then requested a list of comparable properties for comparison purposes which Jones provided to Towler in an email on December 6, 2012.

61.  Turner, Rhodes and Towler met for dinner that night.  Towler's return to Utah was scheduled for late the next day.  When Turner offered to arrange an earlier flight Towler said he planned to stay in Baltimore for the entire next day and engage in further due diligence activities.

62.  In an email on Thursday morning, December 6, 2012, Schwarz said Vision hoped to talk to Citibank that week and asked whether a call with Citibank's counsel could be arranged.  In preparation for their conversation with Tom Lewis, Esquire ("Lewis,") local counsel to Citibank, Schwarz, Towler and counsel to Plaintiffs spoke At 1:30PM that day.  Lewis joined the call thirty minutes later and counsel to Plaintiffs introduced Schwarz and Towler.  A discussion ensued for approximately 40 minutes during which Schwarz asked a number of questions about the history of the loan and the parameters of a possible transaction.  In turn, Lewis asked questions about Vision, the status of their interest and their ability to perform.   In response, Schwarz described Vision's history and capabilities, saying Vision and MSD would jointly participate in the transaction.

63.  On December 7, 2012, Towler wrote counsel to Plaintiffs thanking him for arranging the call with Lewis and requesting a copy of the most recent draft of the Note Purchase Agreement previously negotiated between Plaintiffs and Citibank. Later that day counsel to Plaintiffs sent Schwarz and Towler a copy of that document.

64.  On December 10, 2012, Towler asked for overall pro-forma projections for the Project.  After consultation with Turner and others, Rhodes prepared a set of projections which he emailed Towler in a PDF format later that evening.

65.  On December 11, 2012, Towler requested the Excel version of the projections which Rhodes provided.  Towler also sent an email to Turner, Rhodes, Fore, Bailey, and Schwarz requesting a conference call that afternoon "…to update the progress of the potential financing."

66.  That conference call took place at 1:00PM on December 11, among Turner, Rhodes, Towler, Bailey, Schwarz and counsel to Plaintiffs.  Towler said they were "very close" and were in the process of "crunching numbers" with MSD.  Towler said Vision would be in a position to present a transaction structure in approximately one week.  Towler explained that although Vision originally approached the investment in Westport as conforming to their "standard" model of debt with a two-year maturity and an approximately two times return, it now viewed the opportunity as a longer term investment possibly including additional funds to move the Project along with a possible equity component.  The parties also discussed the alternative of debt with a right to convert all or a portion into equity.

67. On December 14, 2012, Towler indicated he was reviewing organizational documents for the entities involved in Westport and asked Turner about the existence of an amended Operating Agreement for a particular limited liability Company. An email exchange ensued and Turner said he would find the answer.

68. In the evening of December 17, 2012, Towler called Rhodes saying he was in New York with their partner MSD and asked if he could bring two of their people to Baltimore the next day to meet with Turner, see the Project, tour Baltimore and learn more about the project and the market. After confirming Turner and Fore's availability, Rhodes and Towler arranged a meeting in Baltimore the next day.

69. Turner later called Towler and asked about the purpose of the visit. Towler said the MSD representatives had a negative view of Baltimore which he hoped to overcome. At that time Towler also requested a copy of Fore's personal financial statement which was sent the next day.

70. Turner met Towler and MSD representatives Marc Ostiguy and Simon Crocker at the Baltimore train station on the morning of December 18. Turner asked whether either was familiar with Baltimore. One said he went to college in Washington, DC and the other said his impressions of Baltimore came from watching the television series *The Wire*.

71. Turner transported all three to his office where he made a presentation about the Project and responded to numerous questions. During that meeting Towler referred to MSD as Vision's "big brother" and described their relationship. Towler said Vision performed the due diligence for a potential investment, Vision

and MSD provided the required capital with MSD usually providing the larger portion of the funds, and post-closing Vision managed the investment for which they were paid a fee.  At the conclusion of that meeting they first visited the site and then toured various areas of Baltimore.

72.  At the end of the day Turner took the MSD representatives back to the train station and asked what they now thought of Baltimore.  The person whose knowledge of Baltimore came from *The Wire* replied, "I could live here."

73.  Turner, Fore, Rhodes and Towler then had a late lunch and discussed the Project.  Towler said they should be getting a proposal to Plaintiffs "quickly."  Fore purchased a plane ticket for Towler's return to Utah later that day.

74.  As part of his continuing due diligence activities, Towler spoke to representatives of Khovanian Homes on December 19, 2012.  At one time Khovanian was a contract purchaser of residential lots at the Project but the contract expired because completion of the necessary site infrastructure work to prepare the lots for sale was impossible due to uncertainty surrounding the Project's financing.

75.  Turner asked for an update on December 20, 2012, and Towler replied by saying they were continuing their due diligence.  Towler requested information on competing development sites in Baltimore and details on public funds allocated to the Project.

76.  On December 24, 2012, Towler inquired about the state of title to the Property.  Towler was told the Citibank attorney reviewed a recent report and said

the title was clean but Towler wanted a more recent report.  Rhodes sent Towler a

June 8, 2012, title report and agreed to order a bring-to-date.

77.  On December 27, 2012, Rhodes sent Towler the updated title report

requested on December 24.

### Negotiations to Purchase the Note
### Among Plaintiffs, Vision and Citibank

78.    A number of potential investors and partners expressed interest in

Westport over the period during which time Vision conducted its due diligence.  In

mid-December, as Vision was completing its due diligence and nearing the point of

readiness to finalize a transaction, Westport told the other potential partners about

their relationship with Vision and said it would be inappropriate to continue their

discussions unless the transaction with Vision did not proceed.

79.  From time to time Counsel to Plaintiffs communicated with Lewis to discuss

Citibank's position and the status of potential transactions.  Several times in late

December, 2012, Counsel to Plaintiffs advised Lewis that Vision was on the verge of

submitting an offer to Citibank.  Lewis said other parties had expressed some

interest and suggested Vision submit its offer without delay.

80.  On December 27, 2012, Towler sent a Letter of Intent to Forsell,

communicating Vision's proposed terms for the purchase of the Note.  Towler later

told Turner Vision offered approximately $5.5 million for the Note and agreed to

close the purchase by January 15.  Towler later sent Turner an email asking

counsel to Plaintiffs to inform Lewis that Vision submitted that Letter of Intent.

81. In an email to Towler on December 31, 2012, Forsell said Vision's offer was too low and did not include a binding contract or a non-refundable deposit "...so we are not prepared to counter at this time."  Towler forwarded that email to Turner, with a copy to Bailey and Schwarz, saying:

> Here is the response from Lynn at Citi. Our LOI was the first pass at getting a firm price for acquiring the Note. If we can get Citi to negotiate, we are willing to work to a price that is acceptable to both parties. Our LOI contemplated a Purchase and Sale Agreement upon acceptance of the LOI. This would allow us to be engaged with Citi on an exclusive basis. We can do a refundable deposit during the feasibility period but can not do a non-refundable deposit from day 1. We have reached out to Lynn to see if she has time to discuss these issues today.
>
> I think it wuld [sic] be prudent to have [counsel for Plaintiffs] reach out to Lewis to go through this information. [Counsel for Plaintiffs] needs to reinforce that we are *extermely* [sic] *serious about closing this transaction by January 15, 2013.*  (Emphasis added.)

82. At approximately 1:30PM on December 31, a conference call took place among Towler, Schwarz, Turner, Fore, Rhodes and counsel to Plaintiffs.  The potential terms of an improved offer were discussed, including the issue of a non-refundable deposit.  Schwarz said he wanted to engage local counsel to review the loan documents prior to submission of a contract incorporating a non-refundable deposit.  Fore asked about the terms of the transaction between Plaintiffs and Vision.  Schwarz said Vision needed to understand the terms of the deal with Citibank before finalizing the structure with Plaintiffs.  Counsel for Plaintiffs offered to recommend alternatives for local counsel.

83.  One of the people contacted by counsel for Plaintiffs in an effort to provide local counsel recommendations was Mark Friedman, Esq. ("Friedman,") a partner at DLA Piper.  Friedman was asked for suggestions of DLA Piper attorneys for recommendation to Vision.  Friedman was told the matter involved refinancing of the Westport Project, including acquisition of the Note and documentation of the relationship between Westport and Vision.  Friedman asked for the identities of the parties involved to run a conflicts check, and then suggested two lawyers including Richard Levine, Esq. ("Levine").   Friedman said he would confirm DLA's willingness to consider the representation.

84.  At approximately 4:45PM on January 2, 2013, counsel for Plaintiffs sent Schwarz recommendations of lawyers from two local law firms, including Richard Levine at DLA Piper.

85.  At 5PM on January 2, 2013, Friedman wrote "We are all set to go if we can help with that project." At approximately 6PM counsel to Plaintiffs told Schwarz ,"I asked both firms to make sure they did not have conflicts and could undertake the representation….  just got an email from DLA saying they are all set to go if they are asked to help."

86.  On January 3, 2013, Schwarz sent an email saying Vision substantially increased its offer to Citibank and was continuing to work with Citibank's management.

87. On Friday, January 4, 2013, Turner received an email from Addison Palmer of STV, Incorporated, civil engineers for the Project in which Palmer said "We

received a call from Doug Fowler [sic] indicating you're his client and wanting some background regarding Westport and Port Covington. Do you have any objections with us meeting with him or discussing the Westport project?" On January 7, 2013, Turner replied, "We are working with Doug Towler from Vision Capital in Utah, I assume that's who you mean. Yes they are coming in to fund the project moving forward and yes you can discuss it with him."

88. In the early afternoon of January 4, Turner asked Towler if they had heard anything from Citibank, and Towler said no.

89. Later that afternoon counsel to Plaintiffs called Lewis who advised that although the financial terms of Vision's offer were "in the ballpark" Citibank was not willing to accept the offer because it did still not regard it as an unconditional, binding contract to purchase the Note including a substantial nonrefundable deposit. After that position was conveyed to Schwarz he said Vision might be willing to agree to those terms. Counsel to Plaintiffs then relayed that information to Lewis who said if that were true it might alter Citibank's position. At approximately 6:00PM counsel to Plaintiffs arranged a telephone conference between Schwarz and Lewis.

90. After the conversation between Schwarz and Lewis, Schwarz said Vision would confirm its position after an internal meeting the next day and Lewis undertook to locate Forsell to communicate these latest developments to her.

91. On Saturday, January 5, 2013, Turner asked Towler if Vision was going to submit a contract to Citibank. Towler replied saying they were "…discussing a couple of scenarios. I will keep you posted."

92. On Monday morning, January 7, Towler told Turner "I think it all depends on Citi. Let's talk after 2PM". Schwarz said Towler was supposed to have a conference call with Citibank that day. That evening Turner spoke to Towler who declined to provide details, but said Vision was scheduled to have an internal conference call the next morning.

93. In an email at 10:50AM on January 8, 2013, in response to a request for an update Schwarz said "I am going to be tied up all morning in a meeting on an LOI being negotiated on another matter. We did talk to Citi and I believe Doug is going to be flying back to Baltimore tonight."

94. At approximately 1PM on January 8, Towler called Turner and said he was coming to Baltimore the next day to finalize deal terms and was bringing two developers from Las Vegas with whom Vision had done business in the past on deals "out West." Towler said they were consultants he asked to perform a final "litmus test" to validate Vision's due diligence. Later that day Schwarz also confirmed the two individuals were consultants whose only role was to validate Vision's due diligence. At the time he made those statements Towler knew they were false.

95. At 11AM on January 9, 2013, the parties met at the Hyatt Hotel at Towler's suggestion. Turner arrived first and Towler introduced him to three people, not

two: Burton, Dowers and Borden (collectively "BDB,") again describing them as Vision's consultants to provide a "litmus test" of his due diligence. Fore and Robert Hobson arrived shortly thereafter while Turner was talking about the Project. Towler said he had gotten BDB "up to speed" and Burton told Fore BDB only had 72 hours to review the package of information about the Project. Dowers said they would be in Baltimore for two days and wanted to meet with the civil and environmental engineers before they left. Everyone then adjourned to go to the site. Tower, Dowers, Burton and Borden knew the characterization of their role as merely consultants was false.

96. As they were leaving the Hyatt, counsel to Plaintiffs arrived in anticipation of a meeting to discuss the structure of the transaction. Turner, Towler and BDB went to the site in one car, and Fore, Hobson and counsel to Plaintiffs followed in another.

97. Shortly after arriving at the site on January 9, Towler told Turner he was uncomfortable with the presence of counsel to Plaintiffs. After the tour of the site during which a number of questions were asked, Turner, Towler and BDB visited the adjacent neighborhood and then proceeded to Turner's office. Counsel to Plaintiffs dropped Fore and Hobson at Turner's office. Fore joined Turner who showed Silo Point, another of his projects, to Towler and BDB. While walking back to Turner's office Fore asked Towler about BDB's role and whether they were potential investors or substitute developers. Towler reiterated BDB were merely

there as a "litmus test" and no investment or other role had been discussed.  Towler

knew that statement was false.

98.  Turner then made a presentation about the Project and answered numerous

questions.  Burton and/or Dowers reiterated their role as consultants to review

Towler's due diligence on the Project.  At the time they made that statement they

knew it was false.

99. Dowers described his and Burton's prior real estate development experience

and displayed a presentation about a data center Borden purchased from Enron.

Dowers said Borden "will never have to work again because he has made his

fortune."  Turner and Towler discussed the possibility of having dinner that

evening, but Towler called later and said they were going to discuss the Project

among themselves over dinner and would meet the next day to discuss deal terms.

100.     At some point during their meetings on January 9, 2013, Towler said

he planned to meet with Vision's counsel Richard Levine ("Levine") at DLA Piper.

Counsel for Plaintiffs called Levine at approximately 7:45PM and during an

approximately 45 minute conversation provided Levine with detailed background

information about the contemplated transaction and discussed possible deal

structures between Vision and Westport.  Levine raised several issues, including

potential tax liabilities resulting from a foreclosure sale.

101.     At 7:50AM on January 10, 2013, Towler called Turner asking for the

telephone number for Addison Palmer of STV Engineers because he wanted to

arrange a meeting among Palmer, himself and BDB.  Turner asked about their

27

schedule, and at 10:20AM Towler responded with an SMS message saying "We are meeting with counsel at noon.  I will call you after that."  At 11AM, Towler sent an SMS message asking to speak with Jim Hulbert at EA Engineering, an environmental consultant to the Project.  Turner gave Hulbert's cell phone number to Towler, and called Hulbert to give permission for Hulbert to speak to Vision.

102.    At approximately 11:00AM on January 10, counsel for Plaintiff wrote to Levine and offered to provide a complete binder of original closing documents for the Citibank transaction for his review.  Levine picked up those documents later that evening.

103.    Towler sent Turner an SMS text message at 1:52PM on January 10, asking if Turner could meet at DLA Piper's Light Street office at 2:30PM.  Turner replied by asking "What's the agenda?  Who are we meeting with?"  Towler said "Deal points. Can [Fore] come?"  Turner replied, "He's out of town I can get [counsel to Plaintiffs] to come."  Towler responded, "No attorneys".

104.    When Turner advised Fore of the meeting, Fore asked Rhodes to join Turner at DLA's office.  Rhodes was in Towson and although he left immediately he did not think he could arrive by 2:30PM.  Fore asked Turner to delay the meeting if possible.

105.    Turner arrived at DLA Piper's Light Street office at 2:30PM.  Towler was seated at the head of the conference table, BDB were seated to Towler's left, and Turner sat across from BDB.  When Turner arrived, Towler and BDB were concluding a call with Hulbert on a speakerphone.  When the call ended Dowers

28

said EA Engineering spoke very highly about both the Project and Turner, and "they were satisfied with everything he said about the Project."

106.     When Turner asked to delay the meeting until Rhodes could arrive, Dowers said there was no need to wait for Rhodes, and continued "There is only one way we are going to do this deal, and it is very simple."  Dowers then said, "[Towler], explain the offer."

107.     With some apparent discomfort, Towler outlined the terms of the proposed deal between Vision and Westport.  He said "We are willing to purchase the Note and we want to proceed with a foreclosure."  He said Plaintiffs would have a one year option to pay off the note for an amount equal to twice Vision's total cost of acquisition of the note, including all costs of completion of the foreclosure, estimated at between $8-8.5 million, making the option price between $16-17 million.  Vision would not advance any funds other than those necessary to purchase the Note and would not permit partial releases of any parcels or other development activities prior to full payment of the option price.

108.     When Turner asked whether they could discuss extensions of the term or other issues, Dowers said "There will be no extensions—that's the deal."  Turner asked whether Towler would still be the point person, and Dowers said "Yes, deal with Doug."  Although on information and belief Towler and BDB knew BDB would have a significant involvement in the transaction, that information was concealed from Turner.

109.    Turner said he would discuss the proposal with Fore.  As he was leaving he was told Doug and BDB were flying out that afternoon.  Dowers told Turner the proposal would be withdrawn if not accepted by 5:00PM Monday, January 14.

110.    Turner left the meeting at approximately 3PM.  At 3:07PM he received an SMS message from Towler saying "Call me in the morning."

111.    Prior to this visit to Baltimore Towler was very upbeat and his attitude towards the Project and the people with whom he communicated regarding the Project was consistently positive, cooperative and flexible.  Beginning with the meeting at the Hyatt on January 9, however, and continuing throughout the entire visit, Towler's demeanor was noticeably and uncharacteristically awkward and uncomfortable.  He avoided eye contact and seemed reluctant to make the statements he was asked to make.  On information and belief Towler knew BDB's role in the transaction was far more extensive than he disclosed, but intentionally withheld that information from Plaintiffs.

112.    Shortly before 8:00AM on Friday, January 11, 2013, Turner called Towler and expressed his surprise and dismay at the terms of the proposal and the extent to which it deviated from the terms previously discussed.  When Turner said the proposal bore no resemblance to any prior discussions and could never work, Towler simply said "Make a counter-offer.  Let's keep talking about the deal. Tell us what works for you."

113.    At approximately 9:49AM on January 11, Towler wrote to Turner, with

copies to Bailey and Schwarz, and said:

> Rather than have [counsel to Plaintiffs] continue to call Rich Levine,
> the most effecient [sic] method to get resolution to the terms of this
> contemplated transaction is to send us, in writing, the questions you
> have and a counter proposal, if appropriate. This will streamline the
> back and forth process. Based on the circumstances with Citi, we need
> to make sure that we are working efficiently and within a very short
> time frame.
>
> I am in the office today. Let me know if you need anything from me.

114.    At 10AM, approximately ten minutes later, Turner sent Towler an

email in response.  Turner wrote:

> I'm sure you can understand that your proposal came as a bit of a
> surprise.  Until today we thought we were working around a
> framework of at least 2 years and more in the spirit of a JV.  We are
> trying to digest your proposal but need answers to some questions to
> fully understand the implications of the deal."

Turner then asked a series of questions to clarify aspects of the proposal:

> 1. If a foreclosure is necessary (which we'd like to discuss) will you
> commit to buy the property in at the sale or agree, if a bid exceeds a
> predetermined price, to share the proceeds if you elect not to make a
> higher bid?
>
> 2.  What has changed to cause you to now require a 2x return in 1 year
> when you have always told us your target was a 2x return over 2
> years?  Is the 1 year period rigid?
>
> 3. We thought you were going to include some operating funds. What
> happened to that?
>
> 4.  Are these terms driven at all by the need to bring in additional
> funds and *does this proposal reflect the requirements of those new
> investors?  If so, you should tell us because we have investors who we
> put off because of what we believed our relationship with you was to be,
> but who may be willing to participate in the investment on more
> realistic terms than these.*

> Bottom line we need to know if you are willing to negotiate a deal that makes business sense and provides at least a realistic expectation of success. Obviously you see the potential of this project. We hope it is your intention to structure a deal that lets everyone to share in its success. (Emphasis added.)

115.    Towler replied at 11:29AM on January 11, with copies to Bailey and Schwarz. Towler cited difficulties with the transaction and denied that Vision had ever discussed any particular deal structure. He said their attorneys and partners were encouraging them to pass, but did not answer any of Turner's questions.

116.    At 12:14PM on January 11, Turner wrote to Towler, Bailey and Schwarz, saying:

> Thanks for your email. We fully understand the challenges of this deal and appreciate the time and energy you have invested. We still need to understand exactly what you are proposing.
>
> Let's start with the first question I asked before: assuming a foreclosure is the appropriate course of action once you have purchased the note, will our agreement include a commitment by you to bid the property in at the auction? If not, what happens to the proceeds of the sale?

117.    During the prior two months Towler was in constant communication regarding this project and usually replied quickly to emails or telephone calls. Uncharacteristically, for over seven hours Turner received no response whatsoever to his email. Finally, at 7:45PM on January 11, Towler sent a cryptic email to Turner with copies to Fore, Rhodes, Bailey, Schwarz, and—for the first time— Burton, simply saying "Rick Burton will be the point person for this transaction. Please direct all communications to him." Towler knew BDB was going to take Vision's place in the transaction but failed to disclose that information. Towler

knew that Plaintiffs' written consent was required for disclosure of confidential

information to BDB in any capacity other than Vision's consultant or agent and also

knew Plaintiffs' written consent was required for Vision or BDB to enter into any

agreement with Citibank.

118.    Shortly thereafter Burton sent an email to the same people saying:

> I am generally available this weekend and first of the week to discuss
> the proposal discussed at DLA Piper.
> I look forward to hearing from you and moving this deal forward.

119.    Following receipt of the emails from Towler and Burton, Turner and

Rhodes did internet searches on Burton and discovered that a personal Chapter 7

Bankruptcy case was filed by him on May 30, 2012, in the United States

Bankruptcy Court, District of Nevada, and was still open.  The schedule of claims in

that case listed approximately $310 million in debts and only $6,500 in assets,

including $96 in two bank accounts and a $50 watch.  Among the creditors holding

unsecured non-priority claims was a $135 million claim of the Arizona Land

Department for the purchase of land from the state of Arizona, and more than $3

million in claims of the Internal Revenue Service for unpaid income taxes and

penalties for tax years 2005, 2006 and 2007.  *See In re Richard Burton,* Case #:12-

16401-mkn.

120.    Further searches by Turner also disclosed that Dowers filed a personal

Chapter 7 Bankruptcy case in the United States Bankruptcy Court, District of

Nevada, in May, 2010, and was discharged in January, 2012.  Dowers reported over

$120 million in debt and approximately $1.3 million in assets.  *See, In Re Dale*

*Dowers,* United States Bankruptcy Court for the District of Nevada, Case #: 10-16319-bam.

121.     By Saturday, January 12, 2013, when Plaintiffs still had not received a response to the question posed to Towler about bidding at the foreclosure sale, Fore sent an SMS text to Burton at 3:09PM asking whether Burton would authorize Levine to talk to Plaintiffs' counsel about potential "phantom income" resulting from an overbid at the sale.  Burton said he wanted to participate in such a call and would ascertain Levine's availability.  Apparently Burton had not flown out on January 10, and he said he was staying at the Ritz Carlton in Washington, DC. Burton asked if the foreclosure question was the only issue.  Fore responded by saying he was "going over the issues now…" and offered to meet Burton in Washington the next day to address specific questions face to face.

122.     Turner and Fore travelled to Washington, DC on Sunday, January 13, 2013, and met with Burton at 10:00AM. At the meeting they presented a list of issues they felt were essential to resolve with Vision before agreeing to any Vision's purchase of the Loan:

      a.   A willingness to evaluate the pros and cons of a foreclosure;

      b.   Commitments for a minimum bid;

      c.   Sharing of any sale proceeds in excess of an agreed price;

      d.   Structure of ownership;

      e.   Basis in the note;

      f.   Phantom income on an overbid;

    g.  Two year minimum term;

    h.  Extensions upon meeting specified milestones;

    i.  Terms of early payoff;

    j.  Ability to execute documents and agreements necessary to advance the project;

    k.  Partial releases for sales of development parcels;

    l.  Cost of note acquisition; and

    m. Advances of additional working capital

123.     Burton said he was sympathetic to what they were trying to accomplish because he had been through it himself.  He said he did not have the authority to commit to any terms.  He later said because his "…guys were scattered between *Utah and Nevada*…" he would contact them and respond. (Emphasis added.)

124.     At 2:08PM Burton asked for the email addresses of Fore, Turner and counsel to Plaintiff, and at 2:42PM he forwarded an email Levine sent to Bailey, Schwarz, Towler, Burton, Dowers and Borden, providing an explanation of "…how the 'phantom income' applies in the case of a purchase of a note at a discount and a subsequent foreclosure."

125.     At 3:06PM Fore sent an SMS message to Burton saying "Once we know the position on the foreclosure and term, then we can focus on a simple structure."  At 7:10PM Fore asked whether there was any news and at 8:26PM

Burton said "No sir. Some of my guys are out of pocket today, including traveling

back from Denver.  Probably in the am."

126.    At 10:57AM on Monday, January 14, 2013, Burton wrote:

> OK, it is still very early in *LV and SLC*, so I haven't spoken with any
> of my guys this morning. My initial call to *Dale and Ed* last evening
> was not positive regarding a 2 year term. I will be conferencing with
> them today and driving back to Baltimore to meet with Rich[Levine] @
> DLA Piper to discuss challenges with meeting the terms of Citibank.
> (Emphasis added.)

127.    At 11:40AM Fore offered to "drop down to dla with [Turner]". Burton

replied saying he "…just realized [Levine] is unavailable until 4PM today.  I have a

call scheduled with him at that time."  Fore replied "Ok.  If you have feedback from

*Doug [Towler] and the group* and want to talk through things, then we can figure

out if there is a structure that works for everyone without too much brain damage

prior to 4 pm."  Burton responded "I will call you on my drive over."

128.    At 5:11PM on January 14, Burton told Fore "Just now getting to

Baltimore. I will call later for update."  At 6:45PM Burton told Fore "Just got into

hotel and headed for dinner.  Call you after your swim."

129.    On information and belief, Vision reached agreement with Citibank on

the terms of their purchase of the Note by January 15, 2013, and tentatively set a

closing date for sometime at the end of January.  Plaintiff believes a written

agreement was drafted but does not know whether that was signed.  At no time did

Plaintiffs provide written consent to any agreement between Vision, or anyone else,

with Citibank as required by the NDA.  Vision did not disclose any information to

Plaintiffs about their agreement with Citibank.

130.    On information and belief Vision and BDB reached agreement on or before January 15, 2013, whereby BDB assumed Vision's position in the transaction.  BDB was introduced to the transaction and to Citibank by Vision, and relied on Vision's due diligence and the confidential materials provided by Westport. BBD knew about the NDA but BDB and Vision ignored its terms. At no time did Vision or BDB disclose their agreement to Plaintiffs, and Plaintiffs were neither asked nor did they consent to any agreement between Warhorse and Citibank.

## Actions of BDB

131.    At approximately 11PM on January 15, Fore and Burton spoke by telephone.  Fore emphasized the need to address the issues raised during their meeting the previous day. Burton basically reiterated the same terms as Towler's prior proposal, but agreed to allow two 30 day extensions of the one year maturity for $250,000 per month.  He set a deadline for acceptance of the offer of 5:00PM EST the next day.  When Fore asked what would happen if they were unable to reach agreement, Burton said they intended to purchase the Note regardless.  Fore expressly reminded Burton Plaintiff's consent was required for any transaction with Citibank regarding the Note.

132.    At 8:20AM on Tuesday, January 15, 2013, Burton copied Fore on an email to Levine, saying "We had a good conversation with Tom Fore last night and re-conveyed our proposal to him concerning the Westport Waterfront project. We will be back to you after we hear back from Tom and Pat Turner."

133.     Fore responded at approximately 1PM with an email to Burton including the following:

> I've thought about last night's conversation. You said from now on we would only be dealing with u and Dale and Pat can trust you will be fair and reasonable. Obviously because he just met you Pat must trust you and feel comfortable he won't get screwed.
>
> You intend to buy the note one way or another and believe your proposal is Pat's only chance to salvage the deal.  You guys won't promise to buy the property at foreclosure, but if you do Pat will get a one year option to buy the property at a 2X return with two 30 day extensions ($250k ea.)
>
> You're asking Pat to put his future in your hands.  I think I know what Pat's issues will be and because time is so short I need to be able to address his fears.
>
> I'm sure he will want to know 2 things *before he will even consider agreeing to you buying the note*:  what is in it for him if he never gets the option and who will actually call the shots? (Emphasis added.)

134.     In an SMS message at approximately 9:30PM on January 15, Burton said the following:

> I will do my best to generally answer your questions. First, as me and Dale told you last night (and Pat in our other meetings), the principals on our side that is working on this deal are Michael (Mike) Borden, Dale and myself. More than likely, all or most of the monies will be provided by us. If VCP and MSD want to participate, we will determine that *AFTER we have secured the deal with you, Pat and Citibank*. (What portion and who provides the funds should be of no concern).
>
> Secondly, me and Dale have many years of experience and will be on point for our group and be your direct contact for all decision [sic].
>
> We can discuss a minimum bid for the foreclosure sale that will give you some assurances. Also, you mentioned limited advertising and we can surely agree on how that is handled. (Upper case in original, italics added.)

135.     At approximately 9:30AM on January 16, 2013, Schwarz finally responded to counsel for Plaintiffs' emails and voicemails from the prior week with an email saying "…I have been moved onto a different project and not involved on Westport.  Please contact Rick Burton or the Baltimore counsel."  At 10AM, counsel to Plaintiffs reiterated the need to speak to Schwarz, who replied, "I am home sick today.  What do you need to talk to me about".  At 10:09AM, counsel to Plaintiffs replied, "Sorry you are sick.  I need to understand what is going on. Is Vision no longer in this deal?  All of a sudden we are dealing with a new cast of characters." Schwarz never replied.  At the time Schwarz knew Vision had allowed BDB to assume Vision's place in a transaction with Citibank but deliberately failed to disclose that information.

136.     At approximately 1:30PM on January 16, Towler sent an email to Turner with copies to Fore, Schwarz and Bailey, saying "Based on receipt of your current proposal, Vision Capital Partners, LLC will not be pursuing any transaction on Westport. We wish you good luck in your future endeavors."  Although Towler knew BDB was continuing to pursue the Westport transaction in Vision's place and with Vision's consent, he failed to disclose that information.

137.     At 2:15PM on January 16, Fore sent an SMS message to Burton saying, "Vision just said they're out. Should I assume they were speaking for you too?"  Burton replied "No, the offer sent to you by text last night is still on the table as of now."  And one-half hour later Burton said, "Tom, Unfortunately, it is almost 3:00pm and our offer was good thru 5:00pm today."

138.     At 5:01PM on January 16, Burton wrote, "It is 5:00pm and the proposal from last week is now formally withdrawn. I am still available for conversation with you and Pat [Turner] tonight."

139.     At 5:33PM on January 16, Fore asked Burton, "Since we don't have a deal, any idea what citi gonna do".  Burton replied, "To my knowledge, they are proceeding with the foreclosure."  At approximately 6PM, Fore wrote, "ok, thanks. we will resume our negotiations with citi now that the vision team is no longer involved. We had left it to vision for the last week or so but now that its dead we will pick it up again from here."  Burton knew BDB had taken Vision's place in the transaction but intentionally failed to disclose that information.

140.     For the remainder of the evening on January 16, Fore and Burton exchanged text messages, culminating in Burton's message at 10:23PM saying "Talk in the am."  At no time did Burton disclose to Fore that BDB was continuing their efforts to purchase the Loan.

141.     Articles of Organization for Warhorse were filed with the Nevada Secretary of State on January 17, 2013, the day after Towler's email saying Vision was no longer involved with Westport.  The manager of Warhorse is Warhorse Acquisitions, LLC, another Nevada limited liability company, of which Dowers is the manager.

142.     At 8:55AM on January 17, 2013, Fore asked Burton, "Want to hook up today?" and Burton replied, "Sure. I am headed out right now but will check with you later."  At 3:10PM Fore again asked if Burton wanted to connect, to which

Burton asked about Korean restaurants and "Have you and Pat [Turner] reconsidered?"  Although Fore attempted to coordinate a dinner meeting with Burton, it never occurred.

143.     At 11:17PM on January 17 Fore sent the following SMS message to Burton:

> Rich, I am beginning to think something is fishy and we're being played. I sincerely hope I don't find out you are trying to buy Citi's note while allowing us to believe the deal is dead. *So there is no possible misunderstanding, you are not authorized to enter into any agreement with Citi without our consent.* I trust I'm overreacting, but if I'm not we will respond accordingly.  (Emphasis added.)

144.     Shortly before 11AM the next morning, Friday, January 18, 2013, Burton responded with an email to Fore in which he said the following:

> This is in response to the initial text I received from you last night and which I have reread this morning.  Your initial text last night stated as follows:  "Rick, I am beginning to think something is fishy and we're being played.  I sincerely hope I don't find out you are trying to buy Citi's note while allowing us to believe the deal is dead.  So there is no possible misunderstanding, you are not authorized to enter into any agreement with Citi without our consent.  I trust I'm overreaching [sic], but if I am not we will respond accordingly."

> Tom, you are indeed overreaching [sic], and I resent the insulting tone, and self-aggrandizing and bullying statements in your text.  Who are you to tell me who I can or can't do business with?  I have not sought nor do I need to seek your authorization to deal with any person or entity, including but not limited to Citibank, Bank of America, Wells Fargo, Harrah's, the Baltimore Ravens, the City of Baltimore, Wal-Mart, Bo Brooks Restaurant or my aunt Ruth.  Like you, I enjoy the freedom and privilege of doing business with whom I choose.

> Have a good weekend and I wish you the best in your many endeavors.

Burton knew BDB was actively seeking to purchase the Loan but deliberately withheld that information despite Fore's clear request for confirmation of the facts.

145.    At approximately 5:15PM on January 18, counsel for Plaintiffs wrote the following email to Schwarz, Friedman and Levine:

> I am writing to obtain clarification of the current situation regarding the status of efforts to buy the Citibank note secured by a deed of trust on the Westport properties. We had been led to believe the deal was dead, but based on recent communications from Richard Burton we now have reason to believe otherwise. I truly hope that is not the case.
>
> Please advise me immediately of the status of this transaction. If agreements have been reached or negotiations are ongoing, please give me a detailed summary of the terms and identify the parties. If not, please advise me of the status of the transaction when it broke off and what you know about Citibank's plans.
>
> This is a matter of the gravest concern to my clients. Please respond immediately by phone or email.

146.     At approximately 6PM on January 18, in an email to counsel for Plaintiffs with a copy to Bailey, but not Friedman or Levine, Schwarz said, "Vision is not pursuing any transaction related to Westport." Schwarz and Bailey knew BDB was pursuing such a transaction pursuant to an agreement with Vision and their deliberate failure to disclose that information in response to a specific question was an omission of a material fact necessary to make his statement not misleading. At 9:45PM Friedman wrote, "Please address all questions regarding Rick Burton or any affiliated entities to Mark Fields at fields@markfieldslaw.com." Counsel to Plaintiffs immediately responded by asking "Who does DLA represent in this matter?" Friedman never replied.

42

147.    On January 23, 2013, counsel for Plaintiffs wrote to Friedman and Levine, asking, "Last week I asked whom you are representing in this transaction. I don't think I got an answer.  Can you please let me know?" Neither Friedman nor Levine ever replied.

148.    On January 24, 2013, counsel for Plaintiffs again wrote to Friedman and Levine:

> I'm a little perplexed by your silence regarding my question about who, if anyone, you are representing in this transaction.  As I am sure you can understand, the continued absence of any response to a seemingly simple question leads to—hopefully unnecessary—speculation and concern.
>
> If for some reason you can't answer my question I'd appreciate an appropriate explanation.   Otherwise, especially since we referred the people with whom we were working on this project to you in the first place and provided materials to you on their behalf, I don't see anything improper in the question and hope you will respond.

Neither Friedman nor Levine ever replied.

149.    On January 24, 2013, Fore wrote the following in separate emails to Towler and Burton:  "…we were advised that your team is not pursuing Westport. Since we never reached any agreement and have heard nothing further from you we assume that is still the case.  If anything changes please let me know.  Regards, Tom".  Towler replied, "Your statement is correct. VCP is not pursuing the Westport transaction." Towler knew BDB was pursuing such a transaction pursuant to an agreement with Vision and his failure to disclose that information in response to a specific question was an omission of a material fact necessary to make his statement not misleading.  Burton never replied.

150.     Believing the deal with the Vision team, which included BDB as consultants, to be dead, beginning on January 16, 2013, Fore and Turner renewed conversations with several of the potential partners they had put on hold for the purchase of the Note and subsequent development agreements.  Several confirmed their willingness to participate and resumed their due diligence efforts.

151.     One potential investor familiar with the Property and the Project and who had completed his due diligence prior to mid-December expressed a desire to enter into such an arrangement.  He preferred to finalize the terms of a transaction with Citibank before entering into an agreement with Westport.

152.     As time wore on Plaintiffs became suspicious that Vision and/or BDB was still pursuing the transaction with Citibank and contacted Lewis to get the facts.  Lewis declined to provide any information.

153.     During the week of January 21, 2013, the investor said he was in contact with Citibank and Citibank was waiting for him to submit an offer.  On January 24, 2013, the potential investor said he planned to make an offer to Citibank the next day.

154.     Around mid-day on January 25, 2013, the potential investor confirmed his submission of an initial offer to Citibank, and after one increase in the amount he was waiting for their response.  Citibank did not respond to him that day and apparently signed an agreement with Warhorse instead.

## The Contract to Purchase the Note

155.    At 3:53PM on January 25, 2013, Dowers sent and SMS message to Fore containing only his name and telephone number.  Fore then called Dowers, who told Fore "we" purchased the Note, and "we are your new lender."  Dowers provided no further information but said he wished to discuss the matter with Fore at a later time.

156.    On January 28, 2013, Fore, Burton and Dowers spoke on the telephone for approximately 30 minutes and Fore was told BDB jointly paid a $300,000 deposit to Citibank and signed a contract in the name of Warhorse to purchase the Loan for $7.5 million on January 25, 2013.  Dowers said Warhorse was formed specifically for this transaction.

157.    Burton and Dowers said the deadline for closing the purchase was 5:00PM, February 12, 2013.  Dowers described their actions as "opportunistic" and said they wanted to work with Westport and would submit another proposal for Westport's consideration.  They told Fore they were primarily seeking a transaction that would generate quick cash for the two of them since they were personally strapped for funds.  They said they preferred to work out a deal with someone other than Borden, since if he supplied all the money they would not receive any cash in the short run.  They were trying to structure a transaction that benefitted them, not Borden.

158.    On January 29, 2013, Burton sent an email to Fore with a copy to Dowers but not Borden, attaching a letter dated January 29, 2013, from Warhorse

45

to Fore, signed by Dowers as Manager.  In that letter Warhorse proposed a transaction in which Fore would be required to make a non-refundable payment of $1.3 million to the "Current Ownership" of Warhorse by February 1, 2013, two days later.  Current Ownership was not defined and neither Dowers nor Burton responded to Fore's request for specifics.  The proposal further then obligated Fore to pay an additional $7.2 million to Warhorse by February 7, 2013, or forfeit his $1.3 million as liquidated damages.

159.    In essence Warhorse proposed to close the purchase of the Loan—a transaction Fore and Turner negotiated—using Fore's money and then immediately foreclose on the Property at the sale scheduled for February 14, 2013.  Warhorse only agreed to bid a maximum of $7.5 million at the sale.  If the sales proceeds exceeded $7.5 million the Property would be sold to the highest bidder and the first $2 million of the proceeds would go to "Current Ownership".  If the property did not bring more than $7.5 million Fore was nevertheless obligated to either pay "Current Ownership" $2 million in cash, or give them a $4 million first mortgage payable in one year.  In either case Current Ownership would also get a 15% economic interest in the Project.

160.    In other words, Fore was obligated to invest $8.5 million in cash within seven days—the full cost to purchase the Loan plus a $1 million profit.  If the Property sold for $8 million, for example, Current Ownership would realize a $3.3 million profit while Fore would only recover $6 million of his $8.5 investment—a net loss of $2.5 million in two weeks—and the Property would be gone!  If the property

did not bring more than $7.5 million, for the privilege of allowing Warhorse to buy the Note with his money Fore would either have paid a $3.3 million cash premium, or a $1.3 million cash premium plus a $4 million one year mortgage on the Property and give up 15% of the Project.

161.     By this time it was obvious to Fore and Turner that Warhorse and Vision had conspired to conceal and facilitate Warhorse's acquisition of the Loan in a deliberate violation of the NDA but it was too late to prevent them from signing a contract with Citibank.  Fore attempted to ascertain as much of the true facts as possible and told Dowers and Burton he could not properly evaluate any transaction without confirming the existence of the contract with Citibank and reviewing its terms.  Dowers told Fore the contract contained a confidentiality provision and although he could not give a copy to Fore, his lawyers said he could show it to him via a Skype video conference.  Dowers repeatedly boasted that Warhorse would "crush" any opposition by Plaintiffs to their purchase of the Loan.  He volunteered that BDB knew of the NDA prior to signing the contract with Citibank but said since they were not parties to the NDA it had no effect on them and they were free to sign the contract with Citibank.

162.     On February 1, 2013, Fore participated in a Skype video conference with Dowers and Burton, in which Dowers displayed the contract with Citibank on the screen for Fore to read.  During that conference Dowers reiterated that he and Burton knew about the NDA prior to signing the contract, and had no concerns of any kind about any claims Westport might assert.  On information and belief,

Vision and BDB entered into an agreement regarding the assumption of the transaction by BDB, but neither that agreement nor the fact that Vision allowed BDB and Warhorse to take their place was ever disclosed to Plaintiffs.

163.    On February 2, 2013, Turner sent an email to Burton, Dowers, Borden, Bailey, Towler and Schwarz, enclosing the letter attached hereto as Exhibit 2.  In his letter Turner said despite efforts to disguise and conceal their intentions, it now appeared to him that one or more of the recipients of the letter entered into an unauthorized agreement with Citibank to purchase the Loan without Westport's consent.  He went on to say:

> In the absence of our written consent, we regard any such agreement as having been made on our behalf and if you proceed further without our consent we will hold you fully responsible for the substantial damages we will incur as a result.  Furthermore, if you attempt to assign any portion of your interest in this transaction to a third party, such assignee will take subject to our claims. Failure to disclose our position to such third parties could subject you to additional liability for fraud.

164.    Warhorse continues to confirm their intention to close the sale.  They claim to be negotiating with one or more third parties to resell or assign all or a portion of their interest.  On information and belief their Contract with Citibank contains a representation that the Loan is not being acquired for resale, and no assignment is permitted without Citibank's express written consent.

165.    On February 14, 2013, Plaintiffs learned Warhorse retained Kingbarn Realty Capital ("Kingbarn,") a Las Vegas real estate firm, who sent emails soliciting interest in the purchase of the Note to a number of recipients, including Project consultants introduced to Vision and BDB by Plaintiffs.   Kingbarn also distributed

48

packages of information to prospective buyers, offering to sell the Loan for $10 million.  The packages contain confidential information provided to Vision and their consultant BDB during the January 8 and 9 visit to Baltimore.  The package the note purchase agreement and value information are available for "confidential" review subject to Warhorse's approval.  Kingbarn said two appraisals of the property are available; Plaintiffs provided two confidential appraisals to Vision.  These activities clearly violate the NDA, and on information and belief also constitute violations of Warhorse's contract with Citibank.

166.    The actions of Burton, Dowers and Warhorse, as knowingly aided and abetted by Vision, Towler, Bailey and Schwarz, are flagrant, intentional violations of Plaintiffs rights for the express purpose of enriching themselves to the detriment of Plaintiffs.

## COUNT I
## BREACH OF CONTRACT

167.    The allegations contained in the Statement of Facts set forth above are incorporated herein by reference.

168.    Section 1(a) of the NDA expressly prohibits disclosure of Plaintiffs' confidential information to any third party without Plaintiffs' prior written consent.  On numerous occasions Towler, Schwarz, Burton, Dowers and Borden represented that Burton, Dowers and Borden were merely "consultants" to Vision, in the sole capacity of reviewing Vision's due diligence and providing a "litmus test" for Vision's investment in the Project.  At *no* time did any representative of Vision ever advise

Plaintiffs that Burton, Dowers or Borden were functioning in any other capacity, although it is clear that Vision knew otherwise.

169.     At *no* time did Vision ever request or receive written permission to disclose any information to Burton, Dowers or Burton, and at all times all defendants affirmatively represented that they were agents and consultants of Vision's.

170.     Burton and Dowers admitted they had actual knowledge of the NDA prior to signing the Citibank contract on January 25, 2013, and also knew they represented themselves as Vision's consultants at all times when they received Plaintiffs' confidential information.

171.     Towler and Vision spent over two months of full-time, intensive investigation of the Project and the Loan.  Warhorse signed the contract with Citibank only 10 days after Towler disappeared from communications about the transaction.  A decision to make an investment totaling approximately $8 million was obviously made in reliance on the due diligence conducted by Towler and the confidential information supplied by Plaintiffs.

172.     Section1(b) of the NDA expressly provides that for a period of one year neither Vision nor "their partners, *consultants and agents* and any other person to whom they show the Project…" will contact any person or entity introduced by Plaintiffs or circumvent Plaintiffs' position with respect to "…an introduced party of opportunity."  That section goes on to say:

> …Vision further agrees they, or any of the other parties referred to
> herein, ***will not enter into any agreement or relationship with***

> *any introduced party or opportunity* except through the efforts and approval of Westport ....  (Emphasis added.)

173.    Vision represented BDB as their consultant and agent, and said they contacted them because they had previously done business together.  BDB expressly confirmed their capacity as Vision's consultant and agent on multiple occasions.

174.    With Vision's actual knowledge and consent, Vision's consultant and agent subsequently circumvented Plaintiffs, contacted persons to whom Vision was introduced by Plaintiffs and entered into an agreement with respect to an opportunity created and introduced by Plaintiffs in knowing disregard of the NDA and Plaintiffs' express notification of the necessity for their consent.

175.    By entering into the contract with Citibank, Defendants deprived Plaintiffs of the opportunity to pursue the transaction on behalf of the Debtor and others with an interest in preserving the Property and the Project.

176.    Warhorse is a single purpose entity formed on January 17, 2013, for the sole purpose of purchasing the Loan and acquiring the Property.  It is the alter ego of Burton, Dowers and Borden, and it would be inequitable to allow them to shield themselves from liability for their intentional wrongful acts.

**WHEREFORE**, Plaintiffs demand compensatory damages of Twenty-Five Million Dollars ($25,000,000) for breach of contract against Vision Capital Partners, LLC, Dale Dowers, Richard Burton, Michael Borden and Warhorse-Baltimore Realty, LLC.

## COUNT II
## INTENTIONAL MISREPRESENTATION; FRAUD

177.    The allegations contained in the Statement of Facts set forth above are incorporated herein by reference.

178.    As set forth herein, on numerous occasions Towler, Schwarz, Bailey, Burton and Dowler made false statements and omitted to make statements of material facts with actual knowledge of their falsity or materiality, for the express purpose of deceiving Plaintiffs and concealing their actions to allow Warhorse to enter into an agreement to purchase the Loan from Citibank, depriving Plaintiffs and others acting on their behalf from purchasing the Loan, and subjecting Debtor to the possible loss of its property.

179.    Those statements were knowingly false when made and made by each individual with intent to deceive Plaintiffs.

180.    In reliance on those misrepresentations Plaintiffs took no action to prevent Warhorse and Defendants from acquiring the Loan, and proceeded to work with other investors to purchase the Loan on Plaintiff's behalf.  Had they known of Defendants' activities they would have informed Citibank that Warhorse had no authority to purchase the Loan without Plaintiffs' consent.  Instead, Warhorse signed an agreement with Citibank thereby precluding Citibank from contracting with other prospective purchasers.

**WHEREFORE**, Plaintiffs demand compensatory damages for themselves and for the benefit of Debtor against Vision Capital Partners, LLC, Douglas Towler, Victor Schwarz, Edward Bailey, Dale Dowers, Richard Burton, Michael Borden and

Warhorse-Baltimore Realty, LLC for intentional misrepresentation in the amount of One Hundred Million Dollars.

## COUNT III
## CONSPIRACY; AIDING AND ABETTING

181.    The allegations contained in the Statement of Facts set forth above are incorporated herein by reference.

182.    As set forth above, Defendants made fraudulent misrepresentations in order to improperly and unlawfully misuse Plaintiffs' confidential information to enter into agreement with Citibank to the detriment of Plaintiffs and without any right or authority to do so.

183.    Towler, Schwarz, Bailey and Vision had actual knowledge of the activities of Burton, Dowler, Borden and Warhorse, and conspired with them and facilitated their fraud by providing access to Plaintiffs' confidential information in violation of the NDA, introducing Burton, Dowers, Borden and Warhorse to the opportunity to purchase the loan and to the representatives of Citibank in violation of the NDA, and intentionally failed to make statements of material facts, the omission of which they knew or should have known were necessary to make their statements not misleading.

**WHEREFORE**, Plaintiffs demand compensatory damages for themselves and for the benefit of Debtor against Vision Capital Partners, LLC, Douglas Towler, Victor Schwarz and Edward Bailey, for aiding and abetting in the amount of One Hundred Million Dollars ($100,000,000).

## COUNT IV
## CONSTRUCTIVE TRUST

184.    The allegations contained in the Statement of Facts set forth above are incorporated herein by reference.

185.    By concealing and misrepresenting their activities and acting without authority to do so, Warhorse wrongfully converted the right to purchase the Loan to its own use, and dissipated and diverted assets properly belonging and benefitting the Debtor.

186.    From the beginning it was understood by Vision that a prerequisite to any final agreement with Citibank was a binding agreement with Plaintiffs on financial terms between Vision and Plaintiffs.

187.    Plaintiffs negotiated the general terms of the purchase of the Loan and Vision was introduced to Citibank with the express representation that Vision's acquisition of the Loan would be pursuant to an agreement between Vision, Plaintiffs and others on behalf of Westport.

188.    Warhorse, Burton, Towler, and Borden intended to purchase the Loan for their own benefit.  They stated they intended to foreclose on the Property and make a profit at the sale if possible and engaged Kingsbarn Realty Capital in Las Vegas to market the Note for $10 million.

**WHEREFORE**, Plaintiffs request this Court

A.    Impose a constructive trust on any and all rights of Warhorse, other Defendant or any related person to purchase the Loan or any related asset affecting the Debtor, and

B.     Order Warhorse and other Defendants to totally disgorge any and all property, contract rights or other assets related to the Loan or the property of the Debtor.

## COUNT V
## DECLARATORY JUDGMENT

189.     The allegations contained in the Statement of Facts set forth above are incorporated herein by reference.

190.     Plaintiffs are entitled to a declaratory judgment declaring that the contract to purchase the Loan was executed by Warhorse on behalf of Plaintiffs and declaring that Plaintiffs have the right to either assume Warhorse's position and acquire the Loan in accordance with the terms and conditions negotiated by Plaintiffs or, in the event Warhorse acquires the Loan from Citibank to purchase the Loan from Warhorse for the purchase price paid by Warhorse.

**WHEREFORE,** Plaintiffs request this Court issue an Order declaring Plaintiffs as constructive owners of the rights to purchase the Loan and/or any

assets acquired from Citibank or otherwise by Warhorse or other Defendants related to the Debtor, the Property or the Project.

Respectfully submitted,

/s/_____
Jeffrey M. Sirody, Bar #11715
SIRODY, FREIMAN & ASSOCIATES
1777 Reisterstown Road, Suite 360 E
Baltimore, MD 21208
(410) 415-0445
Attorneys for the alleged Debtor


/s/_____
Kenneth B. Frank, Bar #04883
1 South St.
23rd Floor
Baltimore, MD 21202
Phone: 443-691-3600
Attorney for Westport Partners, LLC,
Thomas B. Fore and Patrick Turner